<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT COPPOLA, et al.<br><br>        Plaintiffs,<br><br>v.<br><br>JON H. LARSON, et al.<br><br>        Defendant<br>        . | Hon. Stanley R. Chesler, U.S.D.J.<br><br>Civ. No. 06-2138 (SRC)<br><br>**OPINION** |

**<u>CHESLER, District Judge</u>**

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for a Preliminary Injunction (docket item #2). The Court having considered the papers submitted by the parties, having heard the parties at oral argument on July 17, 2006, and for good cause shown,

**PARTIALLY GRANTS AND PARTIALLY DENIES** the Plaintiffs' Motion (docket item #2) for the reasons set forth below.

### I. BACKGROUND

The *Viking News* (the "Paper") is a student-run newspaper for Ocean County Community College ("OCC"), a two-year, state-funded college. The Plaintiffs, Scott Coppola ("Coppola"), Albert Morales ("Morales"), and Douglas Rush ("Rush") (collectively, "Plaintiffs") were all

student editors for the *Viking News* who held positions with the Paper during the 2003/04 - 2004/05 academic years.  The Defendants in this case are members of the OCC Board of Trustees, OCC, John Larson ("Larson"), president of OCC, as well as Tara Kelly ("Kelly"), Donald Doran ("Doran"), Daniel Duffy ("Duffy"), and Joseph Adelizzi ("Adelizzi") who all held positions with the OCC Administration (collectively "Defendants").  The Plaintiffs are claiming that the Defendants violated their First Amendment rights by exercising prior restraints over the content of articles published in the Paper and taking actions against Plaintiffs in retaliation for the content of articles published in the Paper.  The Plaintiffs are seeking a preliminary injunction "to prevent the Defendants . . . from engaging in acts that are violating the First Amendment rights of student writers and editors of the *Viking News*."  (Pl. Br. at 6.)

The *Viking News* began as a student-run newspaper in 1967.  (Compl. at 4, ¶ 16.) Independent of the school administration, the bi-weekly campus newspaper is written and produced by students who receive no academic credit for their participation.  (Id. at ¶ 15-17.) Plaintiffs Coppola and Rush held positions with the Paper throughout the 2003/04 and 2004/05 academic years.  (Id. at ¶¶ 19, 21.)  Plaintiff Morales held a position with the Paper throughout the 2004/05 academic year and will be returning to the Paper for the 2006/07 academic year.  (Id. at ¶ 20.)

Funding for the Paper comes from OCC student activity fees and advertising revenues. (Id. at 4, ¶ 17.)  For the last thirty five years, Karen Bosley ("Bosley") has served as the Paper's Student Newspaper Advisor.  (Id. at 5, ¶ 22.)  In addition to her position as Student Newspaper Advisor, Bosley is a tenured professor of journalism at OCC, having created the Print and Broadcast Journalism Degree Program at OCC in 1977.  (Id. at 5-6, ¶¶ 22-23.)  Her position as

Student Newspaper Advisor is funded by OCC student activities fees (id. at ¶ 23), and she currently receives $4,850 per year as compensation for the position.  (Id. at 24, ¶ 150.)  As the Student Newspaper Advisor, Bosley advises the Paper's student editors and reporters, but editorial control over the Paper's content remains with the students.  (Id. at 6, ¶ 25.)  It is undisputed by the parties that final authority for publication content, and all associated decisions, resides with the Paper's student editors.  (Id.  See also Ans. at 4, ¶ 25 ("Defendants . . . admit that the student editors exercise and maintain editorial control over the content of the [P]aper and that the editor-in-chief has final authority for publication content.")

In addition to the *Viking News*, a student literary magazine, *Seascape*, and a college radio station, the *Viking Voice*, operate on OCC's campus as student-run activities.  (Compl. at 6, ¶ 25) Like the Paper, these activities operate independently of OCC's academic curriculum and are funded by OCC student activity fees.  (Id.)  Both *Seascape* and the *Viking Voice* each have a dedicated student advisor, a position which is likewise funded by OCC student activities fees. (Id. at 5, ¶ 23.)

The named Defendants are members of the OCC Administration.  Defendant Larson has been President of OCC since the fall semester of 2000.  (Id. at 8, ¶ 34.)  Defendant Kelly is the Vice President/Executive Director of College Relations for OCC.  (Id. at 2-3, ¶ 7.)  Defendant Doran is OCC's Assistant Vice President of Student Development.  (Id. at 3, ¶ 8.)  Defendant Duffy is the Vice President of Student Affairs at OCC.  (Id. at ¶ 9.)  Defendant Adelizzi is Director of Student Media at OCC.  (Id. at ¶ 10.)

In October 2000, the Paper published an article reporting on the inauguration gala being held for then-incoming OCC President, Defendant Larson.  (Id. at 8-9, ¶ 42; Id. at Ex. 1.)  The

3

article reported that the gala was budgeted to cost $50,000, with nearly half of that budget being paid for out of the OCC college budget and student tuition.  (Id. at 8-9, ¶ 42.)  In that same issue, the Paper published an editorial criticizing the OCC administration for not inviting students to the gala, but asking them to volunteer to work at the event.  (Id. at 9, ¶ 43; Id. at Ex. 2.)  In subsequent issues, the Paper reported that the actual costs of the gala were over $78,000 (id. at Ex. 3), and that the remaining funds to finance the gala were coming from the school's Coca-Cola contract fund.  (Id. at Ex. 4.)  This money was also being used to fund campus improvements.  (Id.)  Subsequent editorials also criticized the OCC administration for using these funds to pay for the gala.  (Id. at Ex. 5.)  In January 2001, two of the Paper's staff members received the 2000 Journalism Award for Distinguished Business and Financial Reporting of New Jersey for their coverage of the inauguration gala and investigation into its funding.  (Id. at 10, ¶ 48.)

The Paper continued to publish articles and editorials critical of the OCC administration and their actions.  During the 2000/01 academic year, the paper published numerous editorials criticizing the OCC administration's efforts to institute a new school logo and the new logo's selection process.  (Id. at Ex. 7-8.)  On October 2003, the Paper ran a story reporting on the settlement of a discrimination lawsuit by Defendant Larson's former employer, Luzerne Community College, where Larson served as President from 1997 - 2000.  (Id. at 11, ¶ 54.)  The article reported on claims that Defendant Larson was accused of discrimination and harassment of a Luzerne faculty member on the basis of her ethnicity and age and that he was accused of firing her when she opposed Larson's efforts to get older faculty members to accept early retirement.  (Id. at Ex. 10.)

4

In fall 2003, the OCC administration instituted a policy that the Paper could no longer solicit quotes or comments directly from OCC faculty, staff, or administrative officials, but rather they would have to go through the OCC public relations department before being granted an interview.  (Id. at 11, ¶ 57.)  The Paper published a subsequent editorial highly critical of this new policy.  (Id. at Ex. 11.)   In response, Defendant Kelly wrote a letter on behalf of the OCC administration admonishing the Paper for their editorial position and defending the new policy.  (Id. at Ex. 12.)  Kelly wanted the Paper to publish the entire 732-word letter in the next issue of the Paper, in contravention of the Paper's editorial policy of limiting such submissions to 250 words.  (Id. at 12, ¶ 60.)  Plaintiff Rush refused to give into the request (id. at ¶ 63), but the Paper eventually published 485 words of Kelly's letter.  (Id. at Ex. 12.)

On November 4, 2004, the Paper reported that President Larson planned to change the activity time for extracurricular activities at OCC from 1:40 p.m. to 3:10 p.m.  (Id. at Ex. 13.) The article stated that Larson sent out an email about the change to several OCC administrators, but no students were surveyed on the matter.  (Id.)  The Paper also published an editorial, in the same issue, highly critical of the change, claiming that it would cause a drop-off in student involvement in extracurricular activities and also criticizing Larson for not soliciting student input prior to instituting such a change.  (Id. at 13, ¶¶ 67-68.)

Following the article and editorials on the activities time change, Defendant Kelly requested that Chelsea Michaels ("Michaels"), one of the Paper's editors, meet with President Larson to discuss alleged inaccuracies in the November 4, 2004 issue of the Paper.  (Id. at 13, ¶ 70.)  On November 16, 2004, Michaels and Plaintiff Coppola met with President Larson in his office.  (Id. at ¶ 71.)  At this meeting, Larson and Kelly maintained that the Paper's article was

incorrect regarding the time change proposal and that the OCC administration solicited input at all levels of the OCC community, including students, prior to instituting the proposed activity time change.  (Id. at Ex. 15.)  The Plaintiffs allege that Kelly and Larson accused the Paper of bias and lack of restraint, and admonished Coppola and Michaels for being influenced by the "little devils" working their influence behind the scenes at the *Viking News*, a comment purportedly directed at Bosley's influence as Student Newspaper Advisor over the Paper and its content.[1]  (Id. at ¶ 74.)  Plaintiffs further allege that Larson and Kelly threatened to "take action" against the Paper if it did not retract what they felt were inaccuracies in the article on the time change.  (Id. at 14, ¶ 75.)  The next issue of the Paper included a clarification as requested by Kelly and Larson.  (Kelly Aff. at Ex. C.)  The subsequent issue of the Paper, however, carried an editorial authored by Defendant Coppola entitled *Meeting not just 'fact correction.'*  (Compl. at Ex. 15.)  In this editorial, Coppola claimed that the meeting with Larson and Kelly was "a clear threat to [the Paper and its editors'] First Amendment rights" and a poorly veiled effort at "censorship by intimidation" by the OCC administration.  (Compl. at Ex. 15.)  Coppola maintained that, despite the "clarification," they stand by their original reporting and that the administration's claim that the article was inaccurate was incorrect.  (Id.)  The Paper was later awarded the Enterprise/Investigative Reporting Award by the New Jersey Press Association in

---

[1] The Defendants claim that the reference to the "little devils" was actually made by Coppola and Michaels in response to an inquiry by Kelly and Larson as to whether or not Bosley had influenced the article at issue.  (Def. Br. at 19-20.)  The Defendants, however, concede that Kelly and Larson did inquire directly about Bosley's influence over the Paper's editorials and this article specifically.  (Def. Br. at 19.)  Defendants claim that "Larson wanted to determine if Bosley had exercised prior restraint or had otherwise improperly exerted influence over the content of the story in question."  (Id.)  In response to this inquiry, Coppola responded "that there were no 'little devils at work in this case.'" (Id. at 20.)

the New Jersey Collegiate Press Association Journalism Contest for its coverage of the activity

time change.  (Id. at 15, ¶ 85.)

According to the Plaintiffs, Defendants Larson, Kelly and Duffy began seeking a

replacement for Bosley to act as Student Newspaper Advisor to the *Viking News* in May 2004, on

the grounds that they felt the Paper was unfairly biased against the OCC administration, and "did

not fairly cover [Larson's] administration's viewpoint in their articles."  (Compl. at 15, ¶¶ 86-

88.)  The Defendants deny this allegation. (Ans. at 10, ¶¶ 86-88.)  It is not contested, however,

that in January 2005, the OCC Administration notified Bosley that they were seeking to

terminate her as Student Newspaper Advisor for cause for her failure to submit a five year plan

for the Paper to the OCC Administration.  (Id. at 16, ¶ 91.)  On March 14, 2005, Bosley met with

Defendants Doran and Duffy to discuss her termination.  (Id. at 16, ¶¶ 92-93.)  Plaintiffs allege

that the OCC administration retreated from their efforts to terminate Bosley when she asserted

that any effort to terminate her was in violation of her First Amendment rights.  (Id. at ¶¶ 93-94.)

The Defendants maintain that Bosley was not terminated at this time because she did finally

submit a five year plan for the Paper.  (Def. Br. At 11-12; Duffy. Aff., Ex. D.)

In its October 6, 2005 issue, the Paper ran a story on OCC's sailing program written by

Plaintiff Morales.  (Compl. at Ex. 20.)  Above the article was a photograph of dilapidated boats

that were being stored on OCC's campus as part of a partnership with the New Jersey Museum of

Boating and the Tom's River Seaport Society for possible restoration.[2]  (Id. at 18, ¶ 108.)

---

[2] The photograph, while positioned above the article about the OCC sailing program, did contain a caption that the boats were being stored on the campus for assessment for possible restoration by the Tom's River Sailing Society and the New Jersey Museum of Boating.  (Compl. at Ex. 20.)

Plaintiffs allege that, following the publication of this article, Defendant Doran came to the Paper's offices to meet with the editors.  (Id. at ¶ 109.)  At this meeting, Plaintiffs claim that Doran "berated the [Paper's e]ditors for not portraying the OCC sailing program in a positive light" and criticized Morales for publishing pictures of decaying boats that "portrayed the OCC campus as a 'junkyard' for decrepit boats."  (Id. at 19, ¶¶ 111-112.)

Prior to the fall of 2005, a Student Media Workshop class, taught and graded by Bosley, was required for all students working on the *Viking News*.  (Larson Aff. at 2, ¶ 8.)  In fall of 2005, the OCC administration eliminated these Student Media Workshops.  (Compl. at 19, ¶ 115.)  The Plaintiffs maintain that this action was an effort by the OCC administration to deny the Paper "the primary means by which the *Viking News* would solicit new staff members for the following academic year" and "seriously hamper the *Viking News'* ability to field a staff for the upcoming year."  (Id. at 19, ¶¶ 116-17.)  The Defendants claim that the elimination of the Student Media Workshops was motivated by a concern that Bosley, or any faculty advisor, could use their grading power over students participating in the workshops to wield undue influence over the content of the Paper.  (Def. Br. at 28.)  The Defendants maintain that the decision was made to discontinue these workshops until "such time as a plan was in place to eliminate the inherent conflict of interest."  (Id.)

That same fall, OCC hired Defendant Adelizzi for the newly created position of Director of Student Media at OCC with responsibility for overseeing all three Student Media Advisors, including Bosley.  (Compl. at 19-20, ¶ 118.)  Adelizzi is a general assignment sports writer for the *Asbury Park Press*, and has been a professional journalist for 37 years.  (Def. Br. at 8.)  Upon accepting his new position, Adelizzi began observing the production process at the Paper, and

offering suggestions for improving it.  (Compl. at 20, ¶¶ 119-20.)  Adelizzi made recommendations to the OCC administration regarding the computer platform used by the Paper, suggesting it move to a PC platform, as well as made suggestions to students working on the Paper on how they could improve their work.  (Def. Br. at 13-14.)  Adelizzi provided notes to Plaintiff Coppola on a previously published issue of the Paper, suggesting possible changes to improve the quality of the paper but, specifically noting that Coppola could do what he wanted with the suggestions.  (Adelizzi Aff., Ex. A.)

The Plaintiffs believed that Adelizzi's presence at the Paper's offices was an effort of the OCC administration to spy on them, and constituted a violation of their First Amendment rights.  (Compl. at 20-21, ¶¶ 122-26.)  The Plaintiffs claim that Adelizzi's mere presence in the Paper's offices intimidated the students, making them refrain from writing articles critical of the OCC administration.  (Id.)  They also contend that Adellizi's effort to move the Paper to a PC-based platform and his refusal of funds to purchase additional Macintosh-based computers and software for the Paper is also an effort by the OCC administration to exercise prior restraints on the Paper's content.  (Compl. at 20-21, ¶¶ 130-39.)  Previously, the Paper operated on a local Macintosh-based server, independent from any other networks on OCC's campus.  (Id. at 20, ¶ 129.)  Larson's proposed PC-based system would operate on OCC's server system, which the Plaintiffs fear would subject them to prior examination and review of the Paper's content by OCC administrators.  (Id. at ¶¶ 130-31.)  The Defendants maintain that the proposed technology platform shift was motivated solely by a desire to "improve and integrate the technology of all OCC media and create a teaching environment that models the 'real world' newspaper, television and radio outlets of today" and not by any interest to review or edit the student's work prior to

publication.  (Def. Br. at 15.)  Defendants further note that "vast amounts of confidential data are maintained on the OCC network and, as with most networks, the confidentiality of the information is protected by restricting access to the information through required use of confidential authentication codes, user access protocols, and passwords."  (Id. at 14-15.)

On October 24, 2005, Defendant Doran wrote a letter to Bosley advising her that he would not recommend retaining her as Student Newspaper Advisor for the upcoming school year as a result of her failure to move the Paper from a Mactinosh environment to the "prevailing standard" of PC-based systems and editing mistakes in the Paper.  (Compl. at Ex. 18.)   In December, 2005, the OCC Board approved Doran's recommendation not to renew Bosley's contract as Student Newspaper Advisor.  (Id. at 17, ¶ 101.)  Plaintiffs allege that Bosley's removal was in retaliation for the Paper's unfavorable articles regarding OCC's administration.  (Id. at ¶ 102.)  Defendants claim that Bosley's removal was based on her poor five year plan for the Paper and her uncooperativeness in working with Adelizzi and her refusal to migrate the Paper to a PC-based platform.  (Def. Br. At 12-13.)

In March, 2006, OCC announced the creation of a new Student Media Advisory Board to, among other things, manage publications, evaluate student editor performance, and "govern[] editorial policy."  (Compl., Ex. 22.)  The administration also announced plans to invest up to $30,000 in new technology for the Paper, integrate the technology used by the *Viking News* into an on-line edition, locally hosted on an OCC server, and add a "high level administrative position to oversee development in academic uses of new digital mass media with an oversight role for the *Viking News'* development of and implementation of new technology."  (Id.)  In April, 2006, the OCC administration announced that they would not be hiring a new Student Newspaper

Advisor for the Paper, due to state budget cuts.  (Compl. at 24, ¶ 149.)  In their response papers,

however, the Defendants maintain that they will be hiring a new Student Newspaper Advisor

"during the fall term after a full assessment of the needs and development of an appropriate job

description."  (Def. Br. at 27.)

Plaintiffs have brought suit under 42 U.S.C. § 1983 to challenge the constitutionality of

the actions of the Defendants and are seeking a preliminary injunction to enjoin the Defendants

from (1) removing Bosley from her current role as the Paper's advisor; (2) prevent Defendant

Adelizzi from accessing the *Viking News'* offices during the Paper's production or exercising any

prior review or restraint of the Paper's content on behalf of the OCC administration; (3) prevent

the OCC administration from instituting the proposed Student Media Advisory Board; (4) require

OCC to reinstate the student media workshops for the *Viking News*; and (5) require OCC to

approve the Paper's request for additional Macintosh-based hardware and software and abandon

its plans to move the Paper to a PC-based technology platform.  The Plaintiffs argue that such

actions are necessary to prevent the Defendants from jeopardizing "the Plaintiffs' ability to field

the resources that are essential to the continued publication of an award winning newspaper

during the 2006-07 school year."  (Pl. Br. At 1.)


## II. DISCUSSION

In deciding a motion for preliminary injunctive relief under Rule 65(a), the Court must

consider four factors:

> (1) whether the movant has shown a likelihood of success on the merits; (2) whether
> the movant will be irreparably injured by denial of relief; (3) whether granting
> preliminary relief will result in even greater harm to the nonmoving party; and (4)

whether granting the preliminary relief will be in the public interest. Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C., 212 F.3d 157, 160 (3d Cir. 2000), cert. denied, 531 U.S. 1071 (2001).  Granting such an injunction is an extraordinary measure that should only be done in limited circumstances.  AT&T v. Winback & Conserve Program, 42 F.3d 1421, 1426-27 (3d Cir. 1994).

The Plaintiffs' constitutional claims in this case are based on Title 42 U.S.C. § 1983. Section 1983 provides civil remedies against any person who, under color of state law, deprives another of rights protected by the United States Constitution.  See Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).  Section 1983 does not, by itself, confer any substantive rights, but rather serves as a vehicle to enforce rights granted under the Constitution or federal law.  Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979).  Accordingly, to state a claim under § 1983, a plaintiff must "prove a violation of the underlying constitutional right."  Daniels v. Williams, 474 U.S. 327, 330 (1986).  The Plaintiffs' claims here are based on alleged violations of the "First Amendment rights of student writers and editors of the *Viking News*."  (Pl. Br. at 1.)

"Students in the public schools do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'"  Hazlewood School District v. Kuhlmeier, 484 U.S. 260, 266 (1988) (quoting Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506 (1969)).  A public school, however, does not "possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  Id. at 267 (quoting Hague v. CIO, 310 U.S. 496, 515 (1939)).  School facilities may be deemed to be a public forum "only if school authorities have 'by policy or practice' opened

those facilities for 'indiscriminate use by the general public,' . . . or by some segment of the public, such as student organizations." Id. (quoting Perry Educational Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 47 (1983)).

Student journalists at public colleges generally operate in a 'limited public forum.' Kincaid v. Gibson, 236 F.3d 342, 346 (6th Cir. 2001) (en banc).  A limited public forum exists when the State, either by practice or policy, allows private speech in an area not typically open to the public.  Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 802 (1985).  The Plaintiffs contend, and the Defendants conceded at oral argument, that the school has created a limited public forum in the *Viking News*. (Compl. at 28, ¶ 179)

Once a limited public forum is established, regulation of speech in that forum must be "narrowly drawn to achieve a compelling state interest."  International Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 678 (1992).  The State may exclude speech only if the restrictions are meant to preserve the forum's purpose and are reasonably in relation to that forum's purpose.  Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 829-30 (1995).  While restrictions to preserve the established boundaries of the limited public forum are legitimate, viewpoint-based discrimination "is presumed impermissible when directed at speech otherwise within the forum's limitations."  Id. at 829-30.

Once a limited public forum, like the *Viking News*, has been created, students must be able to express their views free of editorial control and censorship from the school's administration.  Dean v. Utica Cmty Sch., 345 F.Supp.2d 799, 804 (E.D.Mich. 2004) (holding student journalists "must be allowed to publish viewpoints contrary to those of state authorities without intervention or censorship by the authorities themselves").  See also  Antonelli v.

Hammond, 308 F.Supp. 1329, 1337 (D.Mass. 1970) ("Having fostered a campus newspaper, the

state may not impose arbitrary restrictions on the matter to be communicated.")  Public colleges

like OCC cannot respond to content they find offensive by restricting publication of a student-run

newspaper without showing that the "circumstances attributable to the school environment make

necessary more restrictive measures than generally permissible under the First Amendment."  Id.

See also Schiff v. Williams, 519 F.2d 257, 260 (5th Cir. 1975) (holding "right to free speech

embodied in the publication of a college student newspaper cannot be controlled except under

special circumstances."); Joyner v. Whiting, 477 F.2d 456, 460 (4th Cir. 1973) ("[I]f a college has

a student newspaper, its publication cannot be suppressed because college officials dislike its

editorial comment.")  Impermissible editorial control over student-run publications may also

include actions by school administrators that have an indirect but adverse impact on a

publication's ability to publish.  Id. (finding school administrator's activities such as "suspending

the editors, suppressing circulation, requiring imprimatur of controversial articles, excising

repugnant material, withdrawing financial support, or asserting any other form of censorial

oversight based on the institution's power of the purse" also to be impermissible censorship of a

college newspaper).

        The Defendants do not contend that their actions are justified as a legitimate attempt to

impose permissible restrictions on the Paper's content in order to preserve the established

boundaries of this forum.  Their contention is, rather, that their actions do not constitute any

effort to limit or control the content of the Paper nor are they a form of retaliation in response to

the Paper's content.  (Def. Br. at 1.)  The Defendants claim that each of their actions, which the

Plaintiffs claim violated their First Amendment rights, were "absolutely legitimate and in no way

intended to chill or otherwise restrain the student journalists['] protected speech."  (Id.)

### A.      Removal of Bosley as Student Newspaper Advisor to the *Viking News*.

The Plaintiffs contend that the failure to renew Bosley's contract as Student Newspaper Advisor to the *Viking News* was in retaliation for the Paper's publication of articles critical to the current OCC administration.  (Pl. Br. at 1, 18.)   Removal of a student advisor to a school newspaper can indeed be a "particularized, actual injury" to the Paper's student editors.  Lane v. Simon, 2005 U.S. Dist. LEXIS 11330 at *13 (D. Kan. June 2, 2005).  In the present case, the Plaintiffs note that the loss of Bosley will "deprive the *Viking News* editors of the experience, expertise and encouragement and sense of protection that she bestowed upon them."  (Pl. Br. at 18.)  Plaintiffs have furthermore cited to specific administrative tasks that were performed by Bosley during the summer months that are necessary for the paper to proceed in the 2006/07 school year, including arranging for printing services for the paper and dealing with advertising contracts for the coming year.  (Id. at 10-11.)  In response, the Defendants note that the OCC business office is able to facilitate the bidding process for the Paper's printing services for the 2006/07 school year (Def. Br. at 16), and contend that there is no demonstration of particular harm that will come to the Paper's ability to continue through the 2006/07 academic year without the immediate restoration of Bosley as Student Newspaper Advisor.  (Id. at 32-34.)  Nonetheless, if it is shown that Bosley was removed in retaliation for the content of the Paper's articles, such a removal would undoubtedly have an impermissibly chilling effect on the Paper's student editors and their willingness to produce articles critical of the OCC administration in the future.

The Plaintiffs, therefore, must demonstrate that the failure to renew Bosley's contract was

15

motivated by their exercise of protected speech.  The Plaintiffs have demonstrated that the Defendants actively disapproved of many of the Paper's articles and editorials.  The OCC administration has sent letters to the *Viking News* expressing their displeasure with the viewpoints expressed by the Paper and held numerous conversations where the Defendants specifically expressed their displeasure with the Paper and its criticism of the OCC administration.  (Pl. Br. at 22-23.)  The specific interest the Defendants showed in Bosley's potential influence over the student editors in expressing their critical views further underpins the Plaintiffs' argument that the Defendants' failure to renew her contract, after thirty five years as the Student Newspaper Advisor, was in retaliation for the Paper's constitutionally protected publication of items critical of the OCC administration.

Furthermore, the removal and possible elimination of the student advisor position, as announced in April 2006, was only imposed on the *Viking News*, and not on other similarly situated media groups operating on OCC's campus.  The radio station and literary magazine continued to have dedicated student advisors throughout this period, and the OCC administration never announced the elimination of these positions due to budgetary constraints.  Such disparate treatment of similarly situated groups further supports the Plaintiffs' claims that the adverse action of removing Bosley from her position as Student Newspaper Advisor was motivated by the Paper's content.  See, e.g., Stanley v. Magrath, 719 F.2d 279, 284 (8th Cir. 1983) (finding disparate treatment of student-funded newspapers at different university campuses indicative that school administration's adverse action against one of the papers was motivated by disapproval of paper's content).

The Defendants can defend against the Plaintiffs' retaliation claim by demonstrating, by a

preponderance of the evidence, that their removal of Bosley from her post as Student Newspaper

Advisor "would have been taken even in the absence of the protected conduct."  Trotman v.

Board of Trustees, 635 F.2d 216, 224 (3d Cir. 1980).  See also Stanley v. Magrath, 719 F.2d 279,

282-83 (8th Cir. 1983).  The Defendants, however, fail to sustain this burden.  The Defendants

contend, in their papers, that the decision not to renew Bosley's contract for the 2006/07

academic year was because she was "generally uncooperative in working toward[s] OCC's goal

of media convergence."  (Def. Br. at 23.)  The credibility of this reason, however, is undermined

by the OCC administration's prior attempts to remove and replace Bosley and the variety of

reasons offered for her attempted removal.  The Plaintiffs allege that in 2004, Larson tried to

replace Bosley as Student Newspaper Advisor, complaining that the Paper was unfairly biased

against the OCC administration, and "did not fairly cover his administration's viewpoint in their

articles."  (Compl. at 15, ¶¶ 86-88.)  While the Defendants deny this allegation (Ans. at 10, ¶¶

86-88), it is not disputed that the OCC Administration unsuccessfully attempted to remove

Bosley from her position with the Paper in January 2005 for not submitting a five-year plan for

the Paper. (Compl. At 16, ¶¶ 92 & 94; Ans. At 11, ¶¶ 92 & 94; Def. Br. at 11.)   In October 2005,

Bosley was informed that Defendant Doran would not recommend renewing her contract as

Student Newspaper Advisor because of ongoing editing mistakes found in the Paper and

Bosley's refusal to transition the Paper from a Macintosh-based technology platform.  (Compl. at

Ex. 18.)

        In April 2006, Defendant Kelly announced that OCC would not be hiring a Student

Newspaper Advisor, due to state budget cuts, despite the fact that the position was funded by

student activity fees and no similar cuts were taken to eliminate the advisor positions for OCC's

student-run radio station or literary magazine.  (Compl. at 24, ¶¶ 149, 152-53.)  Defendants have

since changed their position on this, and now contend that they will be hiring a new Student

Newspaper Advisor in the fall, "after a full assessment of needs and development of an

appropriate job description."  (Def. Br. at 27.)  It is clear that the OCC administration has sought

to remove Bosley from her position as Student Newspaper Advisor for some time prior to the

current incident, and that they have expressed a longstanding concern about her possible

influence over the Paper's anti-OCC administration content.

  The Court is satisfied that the Plaintiffs here have demonstrated a likelihood of success

on the merits for their contention that the Defendants' actions regarding Bosley's removal as

Student Newspaper Advisor for the *Viking News* was motivated by a desire to retaliate against

the Paper for its expression of constitutionally protected views critical of the OCC

administration.  The Court is further satisfied that such a retaliation would inflict irreparable

harm on the Plaintiffs.  The loss of "First Amendment freedoms, even for minimal periods of

time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976)

(citing New York Times v. United States, 403 U.S. 713, 714-15 (1971)).  See also Forum for

Academic & Institutional Rights, Inc. v. Rumsfeld, 390 F.3d 219, 246 (3d Cir. 2004) rev'd on

other grounds, Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 126 S.Ct. 1297

(2006) (finding that once merits are shown on First Amendment claim, plaintiff has "necessarily

satisfied the second element [for injunctive relief]: irreparable harm") (citing Elrod, 427 U.S. at

373); Beal v. Stern, 184 F.3d 117, 123 (2d Cir.1999) (finding "the irreparable injury issue and the

likelihood of success issue overlap almost entirely" in the First Amendment context).  While it is

questionable whether the Plaintiffs have sustained the burden of showing that Bosley's removal

will undermine their ability to continue the Paper for the 2006/07 academic year, it is clear that such a retaliatory removal would, nonetheless, have an impermissibly chilling effect on the Paper's student editors' freedom of expression in future issues of the Paper, and inflict irreparable harm on the Plaintiffs.

The Plaintiffs have also adequately demonstrated that they can satisfy the remaining two prongs of the standard for granting injunctive relief; namely that the relief being sought will not result in greater harm to the Defendants and that the public interest favors the entry of preliminary restraints.  See Times Mirror Magazines, 212 F.3d at 160.  The retention of Bosley as Student Newspaper Advisor merely maintains the status quo that OCC and the *Viking News* have operated under for the past thirty five years.  Such injunctive relief furthers the public interest of upholding the expressive freedoms and constitutional protections afforded by the First Amendment.  See Forum for Academic and Institutional Rights, 390 F.3d at 246 (holding that "the public is best served" by enjoining state actions that "unconstitutionally impair[] First Amendment rights").  Accordingly, the Plaintiff's Motion to preliminarily enjoin and restrain Defendants from removing Karen Bosley from her position as Student Newspaper Advisor of the *Viking News* is **GRANTED**.

**B.     Defendant Adellizi's Position of Director of Student Media**.

The Plaintiffs are seeking an injunction from this Court enjoining Defendant Adellizi, or anyone other than the *Viking News* staff and Student Newspaper Advisor, from having access to the *Viking News'* office during publication of the Paper and from exercising prior review of the Paper's articles and editorials.  (Pl. Br., Attachment 1 at 3, ¶¶ 8-9 (proposed form of order).)  The

19

Plaintiffs claim that Adellizi's presence in the *Viking News'* offices was "an attempt to predict in advance the content of the *Viking News*" and "an impermissible prior restraint" on the Paper's content. (Pl. Br. at 19.) They further claim that Adellizi's presence as OCC's Director of Student Media is "intimidating" and "looms large over the editors of the student newspaper." (Id.)

The Plaintiffs, however, have not met their burden of showing that Mr. Adellizi's position and his interactions with the Paper's student editors constitute a violation of their First Amendment rights. The Defendants contend that Adellizi's position is to supervise the Student Media Advisors (including Bosley) and assess student media technology. (Def. Br. at 8.) While Adellizi's position may, in some instances, appear to overlap with Bosley's role as Student Newspaper Advisor, there is no First Amendment prohibition on how many faculty advisors OCC may employ to assist the students in producing or improving the overall quality of the *Viking News*.

Adellizi did, as the Plaintiffs contend, provide input to on at least two occasions to student writers/editors on their work in the *Viking News*. (Adellizi Aff. at 3, ¶¶ 8-9.) The Defendants describe a specific occasion, in October 2005, where Adellizi provided Plaintiff Coppola with his written comments and input on a previously published edition of the *Viking News* as indicative of the type of interaction between Adellizi and the Paper's student editors and writers. (Adellizi Aff., Ex. A.) The comments by Adellizi were largely directed at improving the journalistic quality of the publication rather than at altering or influencing the Paper's editorial content. (Id.) Furthermore, the written comments to Coppola were provided with the express caveat that he was free to use the comments in dealing with student reporters, but if he wanted to

use the note with these written comments "as a basketball to put in the trash can at the *Viking News*, that's fine too."  (Id. at 2.)  Because the Plaintiffs have failed to demonstrate how Adellizi's presence in observing the production process of the *Viking News* and his interactions with the Paper's student writers and editors constitute an "adverse content-based action" against the Paper or his actions result in any form of prior restraint on the Paper's content, the Plaintiffs have failed to demonstrate a requisite likelihood of success on their First Amendment claim in this matter.  Accordingly, the Plaintiffs' Motion to enjoin Defendant Adellizi, or anyone other than the *Viking News* staff and Student Newspaper Advisor, from having access to the *Viking News'* office during publication of the Paper is **DENIED**.

**C.**    **OCC's Proposed Student Media Board**.

The Plaintiffs allege that the proposed creation of a Student Media Advisory Board to oversee the *Viking News* and other OCC media outlets is an attempt to censor the Plaintiffs and violate their "constitutionally protected rights."  (Compl. at 26, ¶ 161.)  Since the proposed board has not been instituted and it is unclear to this Court, as well as the parties, what the exact role of this board will be when and if it is created[3] - the Plaintiffs' claims that this board will violate their First Amendment rights are simply too speculative to justify use of such an "'extraordinary remedy [as injunctive relief,] . . . which should be granted only in limited circumstances.'" Winback & Conserve Program, 42 F.3d at 1426-27 (quoting Frank's GMC Truck Center, Inc. v.

---

[3] It is also worth noting that the same announcement that outlines the proposed creation of the Student Media Advisory Board also reiterates "a formal commitment" of the OCC administration "to operate the *Viking News* free of any form of censorship . . . consistent with the established practice of OCC and the established personal commitment of president Jon Larson." (Pl. Br., Ex. 22.)

21

General Motors Corp., 847 F.2d 100, 102 (3d Cir.1988) (citations omitted)).   To justify

injunctive relief, a plaintiff must be able to demonstrate "a 'clear showing of immediate

irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply

to eliminate a possibility of a remote future injury.'" Acierno v. New Castle County, 40 F.3d 645,

655 (3d Cir. 1994) (quoting Continental Group Inc. v. Amoco Chemicals Corp., 614 F.2d 351,

358 (3d Cir. 1980) (citations omitted)).   Since the Plaintiffs can demonstrate no more than the

possibility of a remote future injury from the proposed formation of a student media advisory

board, the Plaintiffs' Motion to enjoin and restrain the Defendants from creating such a board is

**DENIED**.


**D.**     **Discontinuation of the *Viking News'* Student Media Workshops**.

     The Plaintiffs also contend that the cancellation of the Student Media Workshops "will

seriously hamper the Viking News' ability to field a staff for the upcoming year."  (Compl. at 19,

¶ 117.)  The Plaintiffs claim that these workshops were "the primary means by which the *Viking*

*News* would solicit new staff members for the following academic year" (id. at ¶ 116), and that

without these workshops, the "paper's ability to publish during the 2006-07 school year will be

in jeopardy."  (Pl. Br. at 28.)  The Plaintiffs, however, have failed to adequately demonstrate that

the cancellation of these workshops will work sufficient irreparable injury on the Paper and its

ability to continue production in the 2006/07 school year to justify use of such an extreme

measure as injunctive relief.

     These workshops were cancelled by the school in the fall of 2005, and did not render the

Paper unable to recruit an adequate number of students to work on the Paper during the 2005/06

academic year.  (Def. Br. at 33.)  The *Viking News* will continue to have the same opportunity to recruit students to work on the Paper as other student clubs/organizations at OCC.  (Doran Aff. at 4, ¶ 13.)  Incoming freshman at OCC are asked by the Student Life Committee to complete a survey which is used by all campus groups/organizations, including the *Viking News*, to recruit interested new students.  (Id.)  Furthermore, teachers in OCC's communications and journalism classes will continue to provide information to their students about participation in the *Viking News* for the 2006/07 academic year.  (Id.)  Accordingly, because the Plaintiffs have failed to demonstrate irreparable injury from the continued cancellation of these student media workshops, the Plaintiffs' Motion to enjoin and restrain the Defendants from eliminating these workshops is **DENIED**.

E.      **Selection of the *Viking News'* Technology Platform**.

The Plaintiffs contend that the effort to migrate the Paper to a PC-based server on the OCC campus network is an effort by the administration to exercise "prior review and examination of newspaper content by OCC administrators" (Compl. at 21, ¶ 130), and part of a broader "campaign [by the OCC administration] to control [the Paper's] content."  (Id. at ¶ 131.) They further allege that Defendant Adelizzi's refusal to approve the Paper's request to purchase additional Macintosh computers and software "is jeopardizing the *Viking News'* continuing ability to operate on a daily basis" (id. at ¶ 137), and "amount[s] to an indirect form of censorship by disallowing financial support to the Viking News."  (Id. at ¶ 139.)

The Plaintiffs, however, have failed to demonstrate how the inability to immediately acquire new Macintosh computers and software would seriously impair their ability to produce

the Paper during the upcoming school year.  It is undisputed that the *Viking News* currently has

eight (8) Macintosh computers, all of which are between two and five years old.  (Def. Br. at 16.)

The Plaintiffs fail to address how the *Viking News* was able to be produced using these

computers during the 2005/06 academic year, but cannot continue to be produced with the same

number of computers and associated software for the upcoming school year.

The Defendants further maintain that their efforts to move the *Viking News* to a PC-based

platform was never an effort to exercise prior restraint on the Paper's content.  (Def. Br. at 14.)

They argue that the technology move was based on Adellizi's recommendation which was based

on his professional observation of the *Viking News*' production process (Def. Br. At 10, Adellizi

Aff. at 3, ¶ 12.), and was part of a broader effort "to improve and integrate the technology of all

OCC media and create a teaching environment that models the 'real world' newspaper, television

and radio outlets of today."  (Def. Br. at 14.)  Rather than cut funding to the Paper for

technology, the Defendants note that OCC has budgeted up to $30,000 for the implementation of

a new technology platform for the *Viking News* during the Fall, 2006 semester.  (Larson Aff. at 3-

4, ¶ 12)

The Defendants aptly note that, large amounts confidential data are currently maintained

on the OCC network, and there is no reason why the Paper's information could not be similarly

secured and protected while residing on the campus network as well.  (Def. Br. at 14-15.)

According to the Defendants, "OCC stands ready to purchase additional computer equipment and

software for the Viking News and limit access to any PC equipment on the OCC network to

*Viking News* staff."  (Def. Br. at 34.)  Because the Plaintiffs have failed to demonstrate how the

proposed move of the *Viking News* from a Macintosh to a PC-based platform is a violation of

their constitutional rights or that such a move would cause irreparable injury to the Plaintiffs in

continuing the production of the *Viking News*, the Plaintiffs' Motion to enjoin and restrain the

Defendants from refusing to purchase Macintosh computers and software for the *Viking News* or

migrate the Paper to a PC-based environment on an OCC hosted server is **DENIED**.


### III. CONCLUSION

This Court, having considered the papers submitted by the parties, having heard the

parties at oral argument on July 17, 2006, and for good cause shown, **PARTIALLY GRANTS**

**AND PARTIALLY DENIES** the Plaintiffs' Motion (docket item #2).  An appropriate form of

order will be filed herewith.


Dated: July 25, 2006

                                    /s Stanley R. Chesler
                                    Stanley R. Chesler, U.S.D.J.